IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| JONATHAN ALLEN GILL, § | |
| § | |
| Plaintiff § | |
| § | |
| v. § | Civil Action No. 7:09-CV-155-O (BH) |
| § | |
| MICHAEL J. ASTRUE, § | |
| Commissioner of Social Security, § | |
| § | |
| Defendant. § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation for disposition. Before the Court are *Brief for Plaintiff* ("P. Br."), filed December 23, 2009, and *Defendant's Brief* ("D. Br."), filed January 21, 2009. Based on the relevant filings, evidence, and applicable law, the final decision of the Commissioner should be **REVERSED,** and the case should be **REMANDED** to the Commissioner for reconsideration.

**I.  BACKGROUND**[1]

**A.  Procedural History**

Jonathan Allan Gill ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his claim for disability benefits under Title XVI of the Social Security Act. On August 6, 2003, Plaintiff's mother, Teresa A. Gill,

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

protectively filed an application for Title XVI supplementary security income ("SSI") payments on behalf of Plaintiff, who was then a minor. (Tr. at 127-33). She claimed that Plaintiff had been disabled since October 1, 1996, due to a neck sprain, circulatory and metabolic issues, schizophrenia, seizures, and urinary problems. (Tr. at 196). Plaintiff's application was denied initially and upon reconsideration. (Tr. at 22). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 89). He personally appeared and testified at a hearing held on June 9, 2005. (Tr. at 353-375). On September 19, 2005, the ALJ issued her decision finding Plaintiff not disabled. (Tr. at 48-73). Plaintiff requested the Appeals Council to review the ALJ's decision, and on August 14, 2006, the Appeals Council remanded the case to the ALJ for further administrative proceedings. (Tr. at 74-76). On June 30, 2007, Plaintiff appeared and testified at a supplemental hearing before the ALJ. (Tr. at 327-52). On August 5, 2008, the ALJ issued her decision, finding Plaintiff not disabled. (Tr. at 19-45). The Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (Tr. at 6-8). On September 21, 2009, Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.     Factual History**

    **1.     Age, Education, and Work Experience**

Plaintiff was born on September 28, 1985, was 17 years old at the time of his disability application, and was 21 years old at the time of the second hearing before the ALJ. (Tr. at 127, 327). He has a ninth grade education and no past relevant work. (Tr. at 42, 333).

    **2.     Medical Evidence**

Plaintiff's relevant medical evidence began on June 9, 2003, when he was admitted to the

Adolescent Unit at the Red River Hospital for being unable to "think straight." (Tr. at 260). Dr. Harvey Martin, M.D., who evaluated Plaintiff during his hospitalization, noted that Plaintiff had a long history of substance abuse dating back at least three to four years – he had smoked marijuana, huffed ether, and abused alcohol, cocaine, methamphetamine, ice, xanax, ecstacy, soma, and heroin. *Id.* Dr. Martin noted that two months before the hospitalization, Plaintiff had been on an amphetamine trip and had not been able to recollect his thoughts since then. *Id.* He had threatened to kill his friends and family members and believed that the family dogs represented the God and the Devil. *Id.* Dr. Martin reported that Plaintiff appeared spacy, labile, and preoccupied with his own thoughts, that his "narrative tended to be rambling with a 'hippie-dippie' flavor," and that his behavior ranged from being excessively cooperative to totally silent. (Tr. at 261). Dr. Martin diagnosed Plaintiff with polysubstance dependence with hallucinations and delusions, assigned him a Global Assessment of Functioning ("GAF") score of 29, and referred him to Dr. David M. Sabine, Ph.D., for a psychological evaluation. (Tr. at 261-62, 246-248).

During his psychological evaluation by Dr. Sabine, Plaintiff reported feeling a decreased appetite, reduced concentration, and an "invading presence" bothering him. (Tr. at 246-47). Dr. Sabine reported that Plaintiff had a full scale IQ score of 72, a verbal IQ of 80, and a performance IQ of 67. (Tr. at 247). Dr. Sabine noted that even though Plaintiff reported limited substance dependence, his test scores suggested a high probability of a substance abuse disorder. (Tr. at 247). He also noted that Plaintiff's statement that he used marijuana and ecstacy over a year ago conflicted with his father's report that he had been on a methaemphetamine trip two months prior to his hospitalization. (Tr. at 246-47). He opined that Plaintiff was possibly suffering from a thought disorder and schizophrenia, and his overall impression was of schizoaffective disorder and amphetamine-induced psychosis. (Tr. at 246-48). He noted that because it had been a period of

weeks since the reported incident of using amphetamines, Plaintiff's drug use may possibly have "triggered a psychotic break which existed only in an incipient form previously." *Id.* He diagnosed Plaintiff with schizoaffective disorder, substance dependence disorder, and a mathematics disorder, and assigned him a GAF score of 45. *Id.*

On October 27, 2003, during a follow-up meeting with Plaintiff, Dr. Martin described him as "pleasant and engaging," and noted that as far as he knew, Plaintiff was not using any drugs. (Tr. at 257). During that same meeting, Plaintiff's mother reported that Plaintiff was taking his medication and "basically doing well." *Id.* From July to December of that year, Plaintiff also had follow-up appointments with Dr. Martin's assistant, John Dewar, PA-C. During one visit, he described Plaintiff as more put together, upbeat, and outgoing. (Tr. at 259). In another such visit, he noted that Plaintiff was not happy with his medication and "almost threatened violence during the session." (Tr. at 258). In a third follow-up visit, he noted that Plaintiff appeared "calm and friendly, yet with his usual look of being on the brink of losing it, unpredictably." *Id.* He noted, however, that Plaintiff had only one episode of rage during the past month. *Id.*

On December 23, 2003, Dr. Wassel A. Lewis, conducted a psychiatric examination of Plaintiff. (Tr. at 265). During the examination, Plaintiff's father reported that Plaintiff was on psychotropic medication and that the family was pleased with his progress. *Id.* He stated that Plaintiff could only function for three hours without going to sleep or having rage episodes. *Id.* Plaintiff reported that he did not remember the last time he used drugs but later indicated that it was about half a year ago. (Tr. at 266). He was "hostile, highly agitated, uncooperative, and appeared to be unduly suspicious" during the examination. (Tr. at 266-67). He continued to verbalize in a threatening manner that he wanted to leave and became increasingly provocative and disruptive as the interview progressed. (Tr. at 266). Because of this behavior, Dr. Lewis had to terminate the

interview with Plaintiff. *Id.* Dr. Lewis diagnosed Plaintiff with a psychotic disorder, a mood disorder, polysubstance dependance in early full remission, nicotine dependence, borderline intellectual functioning, and a mathematics disorder. (Tr. at 268).

Plaintiff made several visits in 2004 and 2005 to Dr. Martin's certified assistant John Dewar, PA-C, who documented Plaintiff's appearance and progress. On February 4, 2004, he noted that Plaintiff was his "usual tight, paranoid, and irritable self." (Tr. at 309). He expressed extreme disbelief that Plaintiff had been denied social security benefits. *Id.* On April 15, 2004, he noted that Plaintiff was more upbeat than usual, sleeping well, and no longer taking naps during the day. (Tr. at 308). He also noted that Jonathan had fun on a recent camping trip with his family and had not created a crisis. *Id.* On June 11, 2004, he reported that Plaintiff was sleeping and eating well but got upset easily. (Tr. at 305). Plaintiff appeared upbeat but impatient during that visit. *Id.* On August 9, 2004, Plaintiff seemed like his usual loose-thinking, irritable, and impatient self and said that he had been drinking alcohol with his medication. (Tr. at 303). On September 8, 2004, he noted that Plaintiff was doing fine without his medication, had no outbursts, and was sleeping and eating well. (Tr. at 301). On December 2, 2004, Plaintiff seemed very agitated, and his speech was rambling, excited and tangential. (Tr. at 300). He appeared "more schizophrenic than ever before." *Id.* He denied hallucinations but claimed that his dog was seeing things. *Id.* On January 21, 2005 Dewar reported that Plaintiff appeared more upbeat than usual and that he had been "mostly normal at home." (Tr. at 299). The diagnosis in all the notes was substance-induced psychosis. (Tr. at 299-308).

Plaintiff made some follow-up visits to Dr. Martin in the years 2005 and 2006. Medical notes from one of these visits reveal that Dr. Martin considered Plaintiff "a walking billboard for a thought disorder." (Tr. at 320). Dr. Martin noted that Plaintiff had difficulty organizing his

thoughts and was a "happy-go-lucky guy who seem[ed] scotch taped and barely glued together." *Id.* He further noted that Plaintiff did not have the rebelliousness of his teenage years and was not apparently using drugs. *Id.* During these visits, Plaintiff expressed his hopes of becoming a welder, growing a garden, and becoming a tree surgeon, but he seemed to become more disorganized the longer he talked. (Tr. at 320). On September 21, 2006, Dr. Martin noted that Plaintiff "continue[d] to present in a relatively stable fashion at least for him." (Tr. at 319). He reported that Plaintiff proudly talked about playing golf and was working in the family business. *Id.*

### 3. Hearing Testimony

#### a. First Hearing

The ALJ held a hearing on June 9, 2005 where Plaintiff, a medical expert ("ME"), and a vocational expert ("VE") testified. (Tr. at 353). Plaintiff was represented by an attorney. *Id.*

##### i. Plaintiff's Testimony

Plaintiff testified that he was not married, had a ninth grade education, and was living with his parents and six brothers. (Tr. at 357-59). He testified that he was either going to have a lawn business or weld with his father. (Tr. at 359). He did not know how to weld but his father would teach him. *Id.* He testified that he had worked in restaurants where he had washed dishes, prepared burgers, and carhopped. (Tr. at 360-61). He had tried to work at Topco Oil but was unable to do it because he had bladder problems and had difficulty running the cash register. (Tr. at 365).

He testified that his daily activities included watering his yard, taking care of his vegetable garden, reading, walking his dogs, watching TV, listening to the radio, and riding bicycles with his mentally ill brother. (Tr. at 362-64, 365). He stated that he tried to do dishes at home for a week, but he got tired and had to lay down. (Tr. at 362-63). He testified that he did not do drugs, stayed at home, and had dropped all his friends because they did drugs and got in trouble. (Tr. at 364).

ii. Medical Expert's Testimony

The ME testified that Plaintiff's educational records from April of 2000 revealed that he had a learning disability in the area of math but did not have problems with adaptive functioning. (Tr. at 367). She opined that Plaintiff's substance-induced psychotic episode had adversely impacted his cognitive ability and had led to a fault[2] disorder. (Tr. at 368). Plaintiff had problems early on with finding a medication without significant side effects but later appeared to be doing better on Zyprexa two times daily. *Id.* She testified that Plaintiff was still having to sleep a considerable period of the day and that despite his calm and friendly demeanor, Dr. Martin had noted his usual look of being on the brink of losing it unpredictably. *Id.*

Based on the information up to December of 2003, the ME testified that Plaintiff appeared to be drug free. *Id.* She stated that "it appears that based on what initially turned out to be a substance induced-psychotic disorder, as well as cognitive dulling , after he was supposed to be drug free, he still had significant impairment that related to a psychotic disorder with really very significantly impaired functioning." (Tr. at 369). She stated that as of December 2003, Plaintiff had met the listing of 12.03, even without the drug use. *Id.*

iii. Vocational Expert's Testimony

The VE testified that Plaintiff had worked as a kitchen helper (medium, unskilled, SVP 2) and a fast food worker (light, unskilled, SVP 2). (Tr. at 372).

The ALJ asked the VE to assume a hypothetical person of the same age, education, and work experience as Plaintiff, who could do simple three and four-step tasks, but who was unable to work with mathematical or money transactions. *Id.* The ALJ then asked the VE to opine whether such

---

[2] It appears that the court reporter mistakenly typed "fault disorder" instead of a "thought disorder."

- 7 -

a person would be able to perform his past work. *Id.* The VE testified that the hypothetical individual would be able to perform as a fast-food worker but "the kitchen-helper position would be less viable unless he had pretty close supervision, probably closer than most workers would need." *Id.* The VE testified that the same hypothetical individual could perform the jobs of an ironer (35,000 positions in Texas and 408,000 in the United States), a semi conductor package sealer (21,000 positions in Texas and 355,000 in the United States), and a marker in the retail trade (28,000 positions in Texas and 177,000 in the United States). (Tr. at 373). The VE testified that all these positions would be viable even if the hypothetical individual was not able to work with the general public. *Id.*

### b. Second Hearing

The ALJ held a supplemental hearing on January 30, 2007. (Tr. at 327-352). Plaintiff, his father, David Richard Gill, and a VE testified at the hearing. (Tr. at 327).

#### i. Plaintiff's Testimony

Plaintiff rambled throughout his testimony and seemed unable to organize his thoughts. He testified that he was still living with his parents and had not yet started tenth grade. (Tr. at 333). He stated that he had eaten mushrooms and done all kinds of drugs, and had gone to Red River Hospital because of that. *Id.* However, he had been taking Risperdal and Xanax, and had not used any drugs or alcohol after getting out of Red River. (Tr. at 333, 337, 342). He stated that he spent a typical day laying around. (Tr. at 337). He watched TV, listened to music, read books and magazines, and worked on his garden. (Tr. at 337-40). He washed dishes and did some laundry if his mother told him to. (Tr. at 337, 340). He had recently started playing golf. (Tr. at 347). He stated that he had last worked as a dish washer when he was seventeen or eighteen but people at work had made fun of him. (Tr. at 333-34). Upon examination by his attorney, he stated that his

- 8 -

recent attempt to work at Taco Myo was unsuccessful because he could not use the cash register and had bladder problems, and because people at work had made fun of him. (Tr. at 341). He testified that he had not learned welding and therefore had not worked in his family business yet. (Tr. at 335, 347).

### ii. Witness' Testimony

Plaintiff's father, Mr. Gill, testified that Plaintiff's problems were originally caused by drugs when he suffered a psychotic break after a drug incident. (Tr. at 344). He stated that in his unmedicated condition, Plaintiff went from raging mad to extremely happy and within a three hour period went "through that range like on a roller coaster." *Id.* When he took his medication, "he still had his ups and downs but not as severe." *Id.* He testified that Plaintiff had smoked pot twice and had a wine cooler every three to six months over the past three years. *Id.* Mr. Gill stated that he was not self-employed and that he wouldn't be able to help Plaintiff in his work environment. (Tr. at 345). In an environment unsupervised by his family, it would take a trained person to get along with Plaintiff all day. *Id.* He testified that Plaintiff did not play golf on a regular basis and had last played four months ago. (Tr. at 348). He stated that Plaintiff, in mentioning that he played golf, was probably alluding to the time years ago when they both played it together. *Id.*

### iii. Vocational Expert's Testimony

The VE testified that Plaintiff had worked as a fast food worker (light, unskilled, SVP 2) and kitchen helper (medium, unskilled, SVP 2). The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience, who had a fifth grade reading and mathematic level, who was unable to work with the general public or to handle money, and who would be limited to simple tasks. (Tr. at 350). The ALJ then asked the VE to identify the occupations that such an individual would be able to perform. *Id.* The VE testified that the

hypothetical person could perform the jobs of a kitchen helper (medium, SVP 2, unskilled, 15,000 positions in Texas and 300,000 nationally), park worker (medium, SVP 2, unskilled, 7,000 positions in Texas and 90,000 nationallly), harvest worker (medium, SVP 2, unskilled, 25,000 positions in Texas and about $260,000 nationally), and yard worker (heavy, SVP 2, unskilled, 30,000 positions in Texas and 250,000 nationally). (Tr. at 350). Upon cross-examination by the attorney, the VE testified that if the hypothetical individual had grossly impaired insight and judgment, it would be very difficult for him to maintain the jobs without close supervision. (Tr. at 350-51). The VE also testified that there is generally not much tolerance for provocative, uncooperative, and hostile behavior in any type of employment, much less unskilled work. (Tr. at 351).

**C.     ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on August 5, 2008. (Tr. at 19-45). For the period up to Plaintiff's eighteenth birthday, the ALJ analyzed Plaintiff's claim under the modified sequential evaluation applicable to childhood disability. (Tr. at 28-36). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the date of his application. (Tr. at 28, ¶2). At step two, the ALJ found that Plaintiff's psychotic disorder, multiple drug use disorder, schizoaffective disorder, and borderline intellectual functioning were severe impairments. (Tr. at 28, ¶3). At step three, the ALJ found that Plaintiff did not have an impairment or a combination of impairments that met or equaled a listed impairment. (Tr. at 30, ¶4). The ALJ determined that Plaintiff's substance abuse caused his impairments to functionally equal a childhood listed impairment, but that absent his substance abuse, Plaintiff's impairments did not functionally equal a childhood listed impairment. (Tr. at 31-36). Accordingly, the ALJ concluded that Plaintiff was not disabled at any time prior to his eighteenth birthday. (Tr. at 36).

For the period from Plaintiff's eighteenth birthday through the date of the decision, the ALJ analyzed Plaintiff's claim pursuant to the adult five-step sequential evaluation process. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. at 28). At step two, the ALJ determined that Plaintiff continued to have the same severe impairments that he had as a child and had not developed any new impairments. (Tr. at 36). At step three, the ALJ found that when Plaintiff engaged in substance abuse, his impairments met listings 12.03, 12.06, and 12.09. (Tr. at 36). Absent his substance use, however, the ALJ found that none of Plaintiff's impairments, either alone or in combination, met or equaled a listed impairment for presumptive disability under the regulations. *Id.* The ALJ found that absent his substance abuse, Plaintiff had the ability to perform a full range of work at all exertional levels, but he could perform only simple tasks, could not work with money, could work with the general public, and was limited to work that required no more than a fifth grade level of mathematics and reading skills. (Tr. at 38) At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. at 42). At step five the ALJ found that absent his substance abuse and based on his age, education, work experience, and residual functional capacity, Plaintiff could perform jobs that existed in significant numbers in the national economy. (Tr. at 43). The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from the date of his application through the date of her decision. (Tr. at 44).

## II. ANALYSIS

**A.    Legal Standards**

    **1.    Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See Id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

### a. Determination of Childhood Disability

The Commissioner utilizes a sequential three-step inquiry to determine whether a child is disabled and entitled to monthly benefits under the Social Security Act:

1. A child who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. A child who does not have a "severe impairment" will not be found to be disabled.

3. A child whose impairment "meets, medically equals, or functionally equals" a listed impairment in the regulations will be considered disabled.

20 C.F.R. § 416.924(a). If the ALJ finds a severe impairment, he or she must then consider whether the impairment "medically equals" or, as is most pertinent here, "functionally equals" a listed disability. 20 C.F.R. § 416.924(c)-(d).

In determining whether a child's impairment functionally equals a listed disability, the impairments are evaluated for severity in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). In evaluating a child's ability to function in each domain, the Commissioner considers (1) the activities the child is able to perform; (2) the activities the child is not able to perform; (3) which of the child's activities are limited or restricted compared to children of the same age who do not have impairments; (4) whether the child has difficulty with activities at home, in

childcare, at school, or in the community; (5) whether the child has difficulty independently initiating, sustaining, or completing activities; and (6) what kind of help the child needs to do activities, how much, and how often. 20 C.F.R. § 416.926a(b)(2).

If the evidence shows that a child's impairment seriously interferes with his or her ability to independently initiate, sustain, or complete activities, the impairment is considered "marked." 20 C.F.R. § 416.926a(e)(2)(i). If the evidence shows that a child's impairment very seriously interferes with his or her ability to independently initiate, sustain, or complete activities, the impairment is "extreme." 20 C.F.R. § 416.926a(e)(3)(I). In order to demonstrate functional equivalence, the child must exhibit a "marked" limitation in two of the domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).

### b. *Determination of Adulthood Disability*

The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.** **Issue for Review**

Plaintiff presents one issue for review: whether the ALJ's finding that if Plaintiff stopped the substance abuse, he would not have an impairment was supported by substantial evidence and/or resulted from an error of law. (P. Br. at 1).

**C.** **Substantial Evidence**

Plaintiff contends that the ALJ's finding that if Plaintiff stopped the substance abuse, he would not be disabled is not supported by substantial evidence. (P. Br. at 4).

An individual is not disabled if alcoholism or drug addition is a contributing factor material to the determination of disability. 42 U.S.C. § 1382c(a)(3)(J). In determining whether drug or alcohol addiction is a contributing factor material to the determination of disability, the Commissioner considers whether a claimant would still be found disabled if he or she discontinued

using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1). If a claimant's remaining limitations after discontinuing substance abuse would not be disabling, drug or alcohol addiction is a contributing factor material to the determination of disability and the claimant will be found not disabled. 20 C.F.R. § 404.1535(b)(2)(I). The claimant bears the burden of proving that drug or alcohol addiction is not a material contributing factor to his or her disability. *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999).

After summarizing the medical evidence relating to Plaintiff's impairments and pointing to evidence suggesting that Plaintiff may have been drinking during some of his psychotic episodes, the ALJ found that Plaintiff would not be disabled absent his substance abuse. (Tr. at 31, 36). While the medical experts in this case generally agreed that Plaintiff's drug use may have triggered or induced his psychosis, they did not express an opinion that Plaintiff's drug use complicated his impairments. *See Cravin v. Astrue*, 2008 WL 2923867, at *5(N.D. Tex. July 30, 2008) (substantial evidence did not support the ALJ's materiality determination where medical experts did not express an opinion as to whether claimant's drug use intensified her impairments); *see also Dyer v. Astrue*, 2010 WL 304242, at *3 (N.D. Tex. Jan. 26, 2010) (medical evidence must support determination that substance abuse is material).

Medical opinions in the record suggested that Plaintiff's impairments would be disabling regardless of his drug use. The ME stated at the first hearing that "it appears that based on what initially turned out to be a substance induced-psychotic disorder, as well as cognitive dulling , after [Plaintiff] was supposed to be drug free, he still had significant impairment that related to a psychotic disorder with really very significantly impaired functioning." (Tr. at 369). She also opined that as of December 2003, Plaintiff had met the listing of 12.03, even without the drug use.

*Id.* Similarly, Dr. Martin noted that even though Plaintiff was not apparently using drugs, he "seemed scotch taped and barely glued together" and was "a walking billboard for a thought disorder." (Tr. at 320).

Additionally, even though Plaintiff appeared upbeat and stable in some of his visits to Dr. Martin and his assistant, he appeared tight, paranoid, irritable, loose-thinking, impatient, restless, schizophrenic, and violent in others. (*See* Tr. at 257-68, 299-320). One or two references in the record that Plaintiff had a wine cooler every three to six months and had smoked marijuana once or twice over a period of three years do not account for the difference in demeanor. (Tr. at 303, 344). Plaintiff experienced a range of emotions in a matter of hours and was noted to have "his usual look of being on the brink of losing it, unpredictably" even when happy. (Tr. at 258, 344).

The ALJ made her materiality determination by relying on evidence in the record suggesting that Plaintiff *may* have been engaged in substance abuse during the disability period. The ALJ's materiality determination, in the absence of more concrete medical evidence is not supported by substantial evidence. *See Pratt v. Apfel*, 2000 WL 1466099, *1 (W.D. Wash. July 5, 2000).

Defendant contends that the ALJ's improper disability determination does not constitute reversible error because the record as a whole supports the ALJ's conclusion that Gill did not meet listings 12.03 or 12.06, regardless of the impact Plaintiff's substance abuse had on his mental limitations. (D. Br. at 12 to 13). Defendant's contention is unavailing because the overwhelming factor in the ALJ's materiality analysis was that Plaintiff had engaged in substance abuse during the disability period. Absent the disproportionate weight accorded that factor, the ALJ might very well have accorded greater weight to the ME's opinion that Plaintiff met listing 12.03 even without the drug use. (Tr. at 369). Additionally, the ALJ's RFC determination might have included the ME's

opinion that even without drug use, Plaintiff's psychotic disorder resulted in some "very significantly impaired functioning." (Tr. at 369). Since it is not inconceivable that a different administrative conclusion would have been reached absent the ALJ's error, the error is not harmless and is therefore reversible. *See Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

### III. RECOMMENDATION

The decision of the Commissioner should be **REVERSED** and the case **REMANDED** for further proceedings consistent with this opinion.

**SO RECOMMENDED, on this 26th day of February, 2010.**

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE